# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. _____** |
| **OMELYAN BOTSVYNYUK,** | : | **DATE FILED: _____** |
| **a/k/a "Milo"** | | |
| **STEPAN BOTSVYNYUK ,** | : | **VIOLATIONS:** |
| **a/k/a "Stoypa"** | | **18 U.S.C. § 1962(d) (conspiracy to** |
| **MYKHAYLO BOTSVYNYUK,** | : | **participate in a racketeering enterprise -** |
| **a/k/a "Misha"** | | **1 count)** |
| **a/k/a "Mykhailo Churyk"** | : | **18 U.S.C. § 1951 (interference with** |
| **a/k/a "Mykhaylo Churuk"** | | **commerce by threats of violence - 3** |
| **DMYTRO BOTSVYNYUK,** | : | **counts)** |
| **YAROSLAV CHURUK,** | | **18 U.S.C. § 2 (aiding and abetting)** |
| **a/k/a "Slavko"** | : | **18 U.S.C. § 1963 (notice of forfeiture)** |
| **a/k/a Yaroslav Botsvynyuk"** | | |

**FILED UNDER SEAL**

## INDICTMENT

### COUNT ONE
### (Conspiracy to Commit Racketeering)

**THE GRAND JURY CHARGES THAT:**

### GENERAL ALLEGATIONS

1.      The defendants, OMELYAN BOTSVYNYUK, a/k/a "Milo,"

STEPAN BOTSVYNYUK, a/k/a "Stoypa," MYKHAYLO BOTSVYNYUK, a/k/a "Misha,"

a/k/a "Mykailo Churuk," DMYTRO BOTSVYNYUK, and YAROSLAV CHURUK, a/k/a

"Slavko," a/k/a "Yarolslav Botsvynyuk," are all brothers and are citizens of Ukraine.

2.      Defendants, working variously together and with other members known and

unknown of the BOTSVYNYUK ORGANIZATION (hereinafter the "BO"), operated several

cleaning services that were comprised of nighttime work crews that cleaned large and small offices, grocery stores, and chain stores such as Target, Kmart, Walmart, and Safeway, among others.

3.     BO members obtained workers in Ukraine for the nighttime cleaning crews by falsely enticing poor, out of work individuals, mostly men who had completed military service, in Ukraine with promises of good paying jobs, homes, and the possibility of earning $10,000 after three years of working for the defendants in the United States.   The workers were variously told that they could earn between $300 and $500 per month, that their room and board would be taken care of by the defendants, and that the defendants would take care of the travel arrangements from Ukraine to the United States.  Either in Ukraine or after arrival in the United States, the workers were told they owed a substantial debt to the defendants, or clearly understood that a debt was owed, although the amount of the debt was not always clear.

4.     The defendants obtained travel documents and visas, and sometimes passports permitting international travel, to transport the workers from Ukraine to the United States, predominantly via Mexico.

5.     The transportation of the workers occurred in various ways, including flights on international carriers from Germany and Poland to Mexico.  Throughout several portions of the trip from Ukraine to the United States, various known and unknown BO associates met the workers and facilitated the workers' travel at points in between and ultimately to Philadelphia, Pennsylvania.  Once in Mexico, BO associates smuggled the workers illegally across the Mexican-United States border by having the workers wear American-style clothing and instructing the workers to simply state "U.S." to any border patrol representative.  If the workers

successfully crossed into the United States from Mexico, they crossed into southern California, and in at least one instance in Arizona.  Some workers were also placed on international cruise ships from Mexico destined for Los Angeles, California.  Several workers were provided false identification cards.

6.      For those workers who were unsuccessful in crossing the border and were taken into custody by U.S. Border Patrol officers, BO associated attorneys arranged to have them released after almost two months in detention.  Attorneys instructed the workers to falsely claim asylum.  Once released, the immigration detention centers provided dates to the workers to return to court for immigration hearings.

7.      Once in the United States and released from detention centers, or after having arrived by cruise ship, BO associates purchased either plane tickets or bus tickets for the workers and the workers were transported to Philadelphia, Pennsylvania.  For workers taking the bus across the United States to Philadelphia, the bus trip lasted approximately three days with the workers having little or no money during the trip.

8.      Once in Philadelphia, the workers were met by the defendants and were put to work immediately at nighttime cleaning jobs.  Some of the workers lived in the defendants' residences, while others were placed in apartments.  The defendants housed all of the workers. The workers slept on dirty mattresses on the floor, often five or six people to a room.  The defendants confiscated the workers' passports and travel documents and prevented them from returning to California to attend their scheduled immigration hearings.  Thus, the workers remained in the United States illegally.

9.      Once they started working, the workers received little or none of the payment they

had initially been promised in Ukraine.  Several workers did not have enough money to buy

sufficient food or clothing after only having received as little as $100 for the entire month.  In

some cases, workers had to secretly work other jobs - during what was supposed to be their time

to sleep - in order to have enough money to buy food for the month.  Although the workers

worked in several locations, including various locations in the State of Pennsylvania, as well as

New Jersey, New York, Maryland, and Washington, D.C., and were able to move about for

purposes of work, the movement and whereabouts of the workers were monitored.  The workers

were advised that they owed a debt of at least $10,000 that would have to be satisfied before they

received any compensation or were free to leave.  Although a debt was owed to the defendants,

the workers were rarely, if ever, informed as to the exact amount of the debt or how much of the

debt had been paid off due to their labor and their lack of payment.

 10. The work hours varied, but the cleaning crews worked up to 16 hours, or more,

and were housed in low-rent apartments.  The apartments were often unfurnished, and the

laborers were provided with minimal sustenance.  At least one worker, in addition to cleaning

stores at night, was also tasked to clean houses during the day, leaving only about three hours for

sleep.

 11. The BO used intimidation, threats of physical harm, and actual violence on

workers by slapping, punching and kicking workers when the workers either inquired about the

initial promises of payment they had received in Ukraine, or their working conditions.  Some

were slapped if the BO members were dissatisfied with their performance.  If workers were

caught escaping or leaving the defendants' employ, they were struck.  The defendants often

warned the workers that if they did not work, that the workers had families back in Ukraine who

could be harmed and who would be forced to pay off the workers' debts.  The defendants created and fostered an atmosphere and climate of fear by striking and kicking workers in front of other workers, threatening to physically harm or kill the workers, or threatening to harm the workers' families in Ukraine.  In at least one instance, a female worker was brutally raped and kept in a perpetual state of fear and anxiety for her safety.  All the workers were made to fear for their and their families' safety.

12.     After some workers escaped the BO's employ, the defendants resorted to communicating threats to the workers' families in Ukraine either by telephone or in person and threatened the families with harm if the families did not reveal the location of the workers. Threats included threatening to place one worker's approximately eight-year-old daughter in Ukraine into prostitution if the worker did not return to work, and to kill the worker and throw the worker into the ocean to be eaten by the fish.

## THE RACKETEERING ENTERPRISE

At all times material to this indictment:

13.     The defendants, OMELYAN BOTSVYNYUK, STEPAN BOTSVYNYUK, MYKHAYLO BOTSVYNYUK, DMYTRO BOTSVYNYUK, and YAROSLAV CHURUK, and others known and unknown to the grand jury, were members and associates of the "Botsvynyuk Organization" (hereinafter referred to as the "B.O."), a criminal organization whose members and associates engaged in diverse criminal activities including, but not limited to, trafficking in human beings, harboring illegal aliens, forced human labor, and unlawful conduct with passports and immigration documents.

14.     The BO, including its leadership, membership and associates, constituted an

"enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The enterprise operated in the Eastern District of Pennsylvania, the States of California, Maryland, New York, and Pennsylvania and points in between, and the countries of Ukraine, Poland, Mexico, the Netherlands and elsewhere.  This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

15.     The BO recruited and enticed workers from Ukraine to work for the BO in the United States by enticing them with promises of high-paying jobs and room and board.

16.     The BO obtained false passports, travel documents, and visas for their Ukrainian workers and transported the workers from Ukraine through other European countries by land vehicle and air, and into Mexico.

17.     The BO smuggled Ukrainian workers into the United States through California or Arizona and transported them by bus or airplane to Philadelphia, Pennsylvania.

18.     The BO maintained control of its workers through a pattern of threats, intimidation, violence, rape, and psychological coercion.

19.     The BO collected payment for the labor of the workers without paying the workers sufficiently for their labor.

**PURPOSES OF THE ENTERPRISE**

20.     The purposes of the enterprise included the following:

a.     Enriching the members and associates of the BO through, among other things, trafficking in human beings, harboring illegal aliens, forced human labor, and unlawful

conduct regarding passports and immigration documents.

b.     Promoting and enhancing the enterprise and its members' and associates' activities.

## ROLES OF THE DEFENDANTS

21.     The defendants participated in the operation and management of the BO.  The BO was structured in the following manner, and the defendants and other persons employed by and associated with the enterprise functioned in the following roles:

a.     Defendant OMELYAN BOTSVYNYUK was the leader and organizer of the BO trafficking enterprise that operated from at least as early as the fall of 2000 through in or about the spring of 2007.  Defendant OMELYAN BOTSVYNYUK also ran work crews and housed workers at his residence, 3245 Aramingo Avenue, Philadelphia, Pennsylvania, and elsewhere.  The defendant used intimidation, threats of violence and violence to maintain the labor of the workers.

b.     Defendant STEPAN BOTSVYNYUK was a member of the BO who ran work crews composed of forced laborers in the United States.  He also housed workers at his residence, 2612 E. Madison Street, Philadelphia, Pennsylvania, and elsewhere.  The defendant also used intimidation, threats of violence and violence to maintain the labor of the workers.

c.     Defendant MYKHAYLO BOTSVYNYUK was a Ukrainian-based member of the BO who recruited workers for the BO, and assisted in arranging travel for laborers from Ukraine to the United States by obtaining travel documents, visas and plane tickets, and providing the workers with cash for their travel to Mexico and the United States.  The defendant used intimidation, threats of violence and violence to maintain the labor of the workers.

d.      Defendant DMYTRO BOTSVYNYUK was a member of the BO who remained in Ukraine and recruited workers for the BO, and arranged travel for laborers from Ukraine to the United States by obtaining travel documents, visas and plane tickets, and providing the workers with cash for their travel to Mexico and the United States.  The defendant used intimidation, threats of violence and violence to maintain the labor of the workers.

e.      Defendant YAROSLAV CHURUK was a member of the BO who ran work crews and operated from 3184 Emery Street, Philadelphia, Pennsylvania, and also 3012 Salmon Street, Philadelphia, Pennsylvania.  The defendant used intimidation, threats of violence and violence to maintain the labor of the workers.

## THE RACKETEERING CONSPIRACY

22.      From at least the fall of 2000 through in or around the spring of 2007, in Philadelphia, in the Eastern District of Pennsylvania, Ukraine, and elsewhere, the defendants

**OMELYAN BOTSVYNYUK,**
**a/k/a "Milo"**
**STEPAN BOTSVYNYUK ,**
**a/k/a "Stoypa"**
**MYKHAYLO BOTSVYNYUK,**
**a/k/a "Misha"**
**a/k/a "Mykhailo Churyk"**
**a/k/a "Mykhaylo Churuk"**
**DMYTRO BOTSVYNYUK,**
**YAROSLAV CHURUK,**
**a/k/a "Slavko"**
**a/k/a Yaroslav Botsvynyuk"**

being persons employed by and associated with an enterprise known as the "Botsvynyuk Organization" (the "BO"), which engaged in, and the activities of which affected, interstate and foreign commerce, conspired and agreed, with each other, and with others known and unknown

to the grand jury, to violate 18 U.S.C. § 1962(c), that is, to knowingly and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined by18 U.S.C. § 1961(1) and (5), consisting of multiple acts indictable under the following provisions of federal law:

        (a)     Title 18, United States Code, Section 1581, for holding persons in a condition of peonage;

        (b)     Title 18, United States Code, Section 1584, for holding persons in involuntary servitude;

        (c)     Title 18, United States Code, Section 1951, relating to extortion, attempted extortion and conspiracy to commit extortion;

        (d)     Title 8, United States Code, Section 1324, relating to bringing in, transporting and harboring illegal aliens for purposes of financial gain.

## THE AGREEMENT

23.    It was part of the conspiracy that each defendant agreed that at least two acts of racketeering activity would be committed by a conspirator in the conduct of the affairs of the enterprise.

## MANNER AND MEANS

24.    The manner and means used by the defendants to further its goals and achieve its purposes included the following:

        a.     Defendants located in Ukraine, specifically OMELYAN BOTSVYNYUK, DMYTRO BOTSVYNYUK and MYKHAYLO BOTSVYNYUK, solicited and encouraged poor persons, mostly men who had finished military service in Ukraine, and some women, to work for

the enterprise in the United States with promises of good paying jobs and the acquiring of up to $10,000 after three years of service.

        b.      Defendants obtained travel documents, identification documents, visas and transportation tickets for the Ukrainian workers and provided the workers with some cash to use during the travel period from Ukraine to Mexico.

        c.      Defendants smuggled the workers into the United States from Mexico and then transported the workers from the west coast to the Philadelphia, Pennsylvania area by plane or bus.

        d.      Defendants housed the workers, placed the workers in worksite locations, and collected payments from clients of the enterprise who used the workers to clean their stores, offices and houses.

        e.      Defendants used intimidation, threats of force, violence and rape to create a climate of fear and maintain the labor of the workers and ensure the collection of the debts owed for the workers' transportation from Ukraine to the United States.

        f.      If workers escaped or left the employ of the BO enterprise, defendants threatened the workers' family members in Ukraine with violence if the family members either did not reveal the whereabouts of the workers or did not pay off the workers' debts.

## OVERT ACTS

25.    In furtherance of the conspiracy, and to effect the object thereof, the defendants and their co-conspirators committed and caused to be committed the following overt acts, among others, in the Eastern District of Pennsylvania, Ukraine, and elsewhere:

## **T.P.**

From in or around March 2001, to in or around May 2002:

(1)     Defendant OMELYAN  BOTSVYNYUK informed T.P.'s mother, S.Z., that T.P. could obtain work in the United States and earn approximately $500 per month working for a cleaning service in the United States.

(2)     A BO associate known to the grand jury as "Mykola" took T.P.'s passport from him prior to T.P.'s departure for the United States for the purpose of obtaining a Mexican tourist visa.

(3)     Defendant OMELYAN  BOTSVYNYUK secured a bond for T.P. when T.P. was taken into custody by United States immigration officials in California for entering the country illegally from Mexico.

(4)     Defendant OMELYAN  BOTSVYNYUK arranged, via a BO associate known to the grand jury as "Sergey", for T.P. and another worker to travel via bus from California to Philadelphia.

(5)     Once in Philadelphia, Pennsylvania, defendant STEPAN BOTSVYNYUK met T.P. at the bus station in Philadelphia and drove him to defendant OMELYAN BOTSVYNYUK's apartment, located at 3245 Aramingo Avenue in Philadelphia.

(6)     After T.P.'s arrival at the Aramingo Avenue apartment, defendant OMELYAN BOTSVYNYUK told T.P. that he would only be paid $100 per month instead of the $500 previously promised, and that T.P. owed a substantial sum of money to the BO for smuggling T.P. into the United States.

(7)     Defendants OMELYAN BOTSVYNYUK and YAROSLAV CHURUK punched and kicked T.P. in the presence of another worker after a supervisor complained about T.P.'s work at a work site location.

(8)    Defendant OMELYAN BOTSVYNYUK struck other workers in T.P.'s presence.

**S.Z.**

(9)    In or around June 2002, after T.P.'s escape from OMELYAN BOTSVYNYUK's employ, defendant OMELYAN  BOTSVYNYUK, knowing that the threat would be communicated back to T.P., telephonically threatened S.Z., T.P.'s mother, in Ukraine after she declined to reveal T.P.'s whereabouts and stated that he would kidnap her then approximately 14-year-old son and cut off his fingers and ears and send them to her unless she signed over her house as payment for T.P.'s escape.

(10)    In or around June 2002, in another effort to force T.P. to make good on the debt and knowing the threat would be communicated back to T.P., defendant OMELYAN BOTSVYNYUK further threatened S.Z. and told her that he would cut up S.Z. and her husband and stated that there would be "plenty of fresh meat."

**V.M.**

(11)    In or around fall 2000, defendant DMYTRO BOTSVYNYUK recruited V.M. in Ukraine to clean stores in the United States by telling him that after three years' labor in the United States V.M. would receive approximately $10,000.

(12)    In or around March 2001, defendant MYKHAYLO BOTSVYNYUK, in Kiev, Ukraine, provided V.M. and other workers plane tickets to travel to Mexico.

From in or around May 2001, to in or around December 2001:

(13)    Defendant STEPAN BOTSVYNYUK put V.M. to work cleaning a Philadelphia clothing store at night.

(14)    Defendant STEPAN BOTSVYNYUK informed V.M. that if anyone tried to escape

-12-

the BO's employ and avoid the debt, B.O. members would find them and harm their families back in Ukraine.

(15)   Defendant STEPAN BOTSVYNYUK told V.M. that V.M. owed defendant STEPAN BOTSVYNYUK approximately $40,000 which would be paid off after three years' labor.

(16)   Defendant STEPAN BOTSVYNYUK struck V.M. for using a payphone and warned V.M. not to attempt to run away.

(17)   On or about November 3, 2005, defendant STEPAN BOTSVYNYUK told V.M. in a telephonic conversation, "Sooner or later, you'll pay me back the debt.  Remember this."

## M.S.1.

From in or around May 2001, to in or around July 2001:

(18)   Defendant DMYTRO BOTSVYNYUK recruited M.S.1. to work for the BO by advising M.S.1. that defendant DMYTRO BOTSVYNYUK could obtain visas for her and her husband to leave Ukraine and travel to the United States.

(19)   Defendant DMYTRO BOTSVYNYUK arranged for M.S.1 to travel via bus to Kiev, Ukraine, where she was met by a BO associate known to the grand jury as "Lyuda".

(20)   The B.O. associate known to the grand jury as "Lyuda" arranged for M.S.1 and other workers to travel via train from Kiev to Ternopil, Ukraine, and then to Poland via automobile before boarding a plane to Germany and finally Tijuana, Mexico, where M.S.1 arrived on or about July 12, 2001.

(21)   Defendant OMELYAN BOTSVYNYUK took M.S.1's passport after she arrived in Philadelphia in or around July 2001 and told her, "You will do everything I tell you to do."

(22)    Defendant OMELYAN BOTSVYNYUK put M.S.1 to work cleaning houses during the day and cleaning offices during the night.

(23)    On Sundays, defendant OMELYAN BOTSVYNYUK compelled M.S.1 to cook for him and clean his apartment.

(24)    Defendant OMELYAN BOTSVYNYUK hit and kicked some male workers in M.S.1's presence.

(25)    Defendant OMELYAN BOTSVYNYUK threatened M.S.1 by telling her, among other things, that he would "Put her in a bag and throw her into the ocean and the fish would eat her."

(26)    Defendant OMELYAN BOTSVYNYUK, threatened M.S.1. that if she went outside of the apartment, she would be arrested by the police and deported to Ukraine where she would continue to work off her debt to the BO.

(27)    Defendant OMELYAN BOTSVYNYUK, in an effort to maintain her labor, ensure she satisfied the debt, and not to attempt to escape, told M.S.1. to remember that she had a family in Ukraine and a "little prostitute" in Ukraine who would work off M.S.1.'s debt, referring to M.S.1.'s then approximately eight-year-old daughter in Ukraine.

(28)    Defendant OMELYAN BOTSVYNYUK physically assaulted M.S.1 by pulling out her hair, thereby causing her head to bleed, and throwing her down a flight of stairs which caused her to lose consciousness while she was living at his residence, located at 3245 Aramingo Avenue, Philadelphia, Pennsylvania.

From in or around August 2001, to in or around April 2002:

(29)    Defendant OMELYAN BOTSVYNYUK raped M.S.1.

(30)    Defendant OMELYAN BOTSVYNYUK tied M.S.1's hands in front with a clothesline and taped her mouth shut and then raped M.S.1 a second time.

(31)    Defendant OMELYAN BOTSVYNYUK raped M.S.1. a third time and then permitted two unknown adult males to rape M.S.1 immediately afterward.

**V.S.**

From in or around May 2001, to in or around November 2002:

(32)    Defendants DMYTRO BOTSVYNYUK and OMELYAN BOTSVYNYUK recruited V.S., M.S.1.'s husband, in Ukraine to work for the BO in the United States.

(33)    BO members provided V.S. a passport in the name of "Joseph Weber" to use for international travel from Turkey to the United States.

(34)    Upon V.S.'s arrival in the United States, defendant OMELYAN BOTSVYNYUK confiscated from V.S. the passport in the name of "Joseph Weber" used by V.S. to enter the United States.

(35)    Defendant OMELYAN BOTSVYNYUK put V.S. to work cleaning stores, such as supermarkets.

(36)    Defendant OMELYAN BOTSVYNYUK struck V.S. in the head and rib cage and then kicked him.

(37)    From on or about July 15, 2002, to on or about November 19, 2002, in an effort to maintain V.S.'s labor and to ensure he satisfied the debt, defendant OMELYAN BOTSVYNYUK repeatedly reminded V.S. that he had a young daughter in Ukraine, and that there would be

consequences to her if he stopped working and left the BO.

## N.Y.

(38)     In or around November 2002, after M.S.1 and V.S. escaped defendant

OMELYAN BOTSVYNYUK's employ, knowing the threat would be communicated back to

M.S.1 and V.S., defendant OMELYAN BOTSVYNYUK telephoned V.S.'s mother, N.Y., in

Ukraine, and told N.Y. that M.S.1 and V.S. had run away and threatened that "bad blood would

cover" N.Y. and her granddaughter N.S. (meaning that they would pay the consequences) if

M.S.1.'s and V.S.'s debt was not paid.

From in or around spring 2005, to in or around spring 2006:

(39)     Defendant OMELYAN BOTSVYNYUK visited N.Y. in Ukraine and threatened to

take V.S.'s and M.S.1's daughter, N.S., to a whorehouse where the child would work off the money

her parents owed to the BO, knowing the threat would be communicated back to V.S. and M.S.1.

(40)     Defendant OMELYAN BOTSVYNYUK visited N.Y. again and threatened N.Y. by

stating that he was "going to deal with [her] again."

(41)     In or around spring 2007, in Ukraine, in an effort to force M.S.1 and V.S. to make

good on their debts and knowing that the threat would be communicated back to M.S.1 and V.S.,

defendant OMELYAN BOTSVYNYUK asked N.Y. about the whereabouts of N.Y.'s son, V.S.,

and stated that he needed V.S. to "be healthy, so [he could] deal with him," which N.Y. understood

to mean that defendant OMELYAN BOTSVYNYUK still intended to harm M.S.1 and V.S. for

escaping and not paying back their debts to the BO.

## N.S.

(42)     From in or around spring 2005, to in or around spring 2006, defendant

OMELYAN BOTSVYNYUK visited N.S. and N.Y. in Ukraine, physically grabbed N.S. - who was approximately 12 years old at the time - and, knowing that the threat would be communicated back to M.S.1 and V.S., told N.S. that he was going to force her to work off the money owed to him by her parents.

### Y.V.

From in or around fall 2000, to in or around March 2001:

(43)   A BO representative known to Y.V. as "Vasily" recruited Y.V. in Ukraine to work for the BO in the United States.

(44)   Vasily told Y.V. that travel arrangements for Y.V. would be made through Mexico, and that the Mexican embassy in Ukraine would provide a visa.

(45)   BO associate Vasily told Y.V. that Y.V. would earn wages of approximately $500 per month as well as an additional $200 to $300 per month in expenses to be used for rent and food.

From in or around March 2001 to in or around the summer of 2002:

(46)   Defendant MIKHAYLO BOTSVYNYUK, in Ukraine, told Y.V. that the terms of employment were being changed, that Y.V. would earn $300 per month instead of the $500 that had been promised to Y.V., and that Y.V. would be working for the BO for three years instead of two.

(47)   Defendant MYKHAYLO BOTSVYNYUK paid travel expenses, hotels, and other expenses for Y.V. and two other men to travel from Ukraine to the United States.

(48)   Defendant MYKHAYLO BOTSVYNYUK provided Y.V. and the others traveling with him approximately $800 to $1,000 each for traveling expenses from Ukraine to Mexico.

(49)     A BO associate, known to the grand jury as "Gregori", met Y.V. in Mexico City,

Mexico, and instructed and assisted Y.V. and others to cross the Mexican border into the United

States.

(50)     After Y.V.'s arrival in Philadelphia, defendants OMELYAN BOTSVYNYUK and

STEPAN BOTSVYNYUK told Y.V. that he would work seven days a week and that the

experience would be "worse than the [Ukranian] army and worse than jail."

(51)     Defendant STEPAN BOTSVYNYUK struck Y.V. with his fist and choked him with

a belt in the presence of  other workers after defendant STEPAN BOTSVYNYUK demanded

Y.V.'s passport and Y.V. failed to produce it.

(52)     Defendant STEPAN BOTSVYNYUK punched and kicked Y.V. because Y.V. was

not home when defendant STEPAN BOTSVYNYUK looked for him earlier in the day to replace a

sick worker on a cleaning job.

(53)     In or around fall 2004, after Y.V. had escaped the BO's employ in the fall of 2003,

defendant STEPAN BOTSVYNYUK and an associate found Y.V. in Allentown, Pennsylvania,

and in an effort to force Y.V. to make good on the debt, they told Y.V. "You thought we wouldn't

find you", and then defendant STEPAN BOTSVYNYUK ordered Y.V. back to Philadelphia to

work and forced Y.V. to sign a paper acknowledging a debt.

## M.S.2.

From in or around fall 2000, to in or around November 2002:

(54)     In Ukraine, defendant MYKHAYLO BOTSVYNYUK recruited M.S.2. to work for

the BO in the United States by telling M.S.2 that he could earn approximately $500 to $800 per

month in the United States working for the BO.

(55)     Defendant MYKHAYLO BOTSVYNYUK directed M.S.2 to obtain a travel passport and told M.S.2 that he (MYKHAYLO BOTSVYNYUK) would pay for the travel arrangements to the United States.

(56)     Defendant MYKHAYLO BOTSVYNYUK drove M.S.2 to Kiev, Ukraine, to board a plane and fly to Mexico.

(57)     After M.S.2 arrived in Philadelphia, defendant STEPAN BOTSVYNYUK told M.S.2 that if he did not work, defendant STEPAN BOTSVYNYUK would kill him.

(58)     Defendant STEPAN BOTSVYNYUK put M.S.2 and others to work cleaning Target stores and other retail chains in Albany, New York, and Kingston, New York.

(59)     Defendant STEPAN BOTSVYNYUK told M.S.2 that if he ran away and failed to satisfy the debt, the BO would arrange to have M.S.2's brothers in Ukraine arrested and jailed.

(60)     After M.S.2.'s two sisters escaped the BO's employ in November 2002, defendants STEPAN BOTSVYNYUK and OMELYAN BOTSVYNYUK beat M.S.2 over a period of three days after M.S.2 refused to reveal the whereabouts of his two sisters.

(61)     Defendant STEPAN BOTSVYNYUK told M.S.2 that he would work for the BO "as long as I tell you" in order to satisfy the debts M.S.2 and his sisters owed the BO.

## Y.S.

From in or around February 2000, to in or around June 2000:

(62)     In Ukraine, defendant DMYTRO BOTSVYNYUK recruited Y.S. to work for the BO and told Y.S. that he could earn approximately $500 per month plus room and board in the United States.

(63)     Defendant DMYTRO BOTSVYNYUK took Y.S.'s passport and arranged for him to

travel with others as a group to the United States under the guise that the workers were part of an American-style football team.

(64)    Defendant DMYTRO BOTSVYNYUK told Y.S. that Y.S. owed the B.O. approximately $10,000 for getting him into the United States.

(65)    Defendant DMYTRO BOTSVYNYUK paid for train tickets for Y.S. and another worker to travel from Chernovtsi, Ukraine, to Kiev, Ukraine, where Y.S. boarded a plane to the United States.

(66)    Defendant YAROSLAV CHURUK and other BO associates met Y.S. at the JFK airport in New York City.

(67)    Defendant YAROSLAV CHURUK took possession of Y.S.'s passport and kept it.

(68)    Upon Y.S.'s arrival in Philadelphia at defendant YAROSLAV CHURUK's apartment, defendant YAROSLAV CHURUK threw a chair at Y.S. and struck two workers in Y.S.'s presence, and told Y.S., "If you behave, this will not happen to you, and everything will be fine."

(69)    From on or about June 16, 2000, to on or about December 31, 2002, defendant YAROSLAV CHURUK struck Y.S. on several occasions and told Y.S. that Y.S. would work for defendant YAROSLAV CHURUK for the rest of his life and that defendant YAROSLAV CHURUK would kill Y.S. or make him an invalid.

## O.H.

(70)    In or around March 2001, defendant OMELYAN BOTSVYNYUK recruited O.H. in Ukraine to work for the B.O. in the United States by telling her that she would earn good money babysitting in the United States and could repay the BO's expenses for her travel in three years.

(71)    From in or around April 2001, to in or around July 2001, defendant

DMYTRO BOTSVYNYUK received from O.H. her Ukrainian passport and used it to obtain travel

documents to Mexico for O.H.

(72)    In or around July 2001, defendants OMELYAN BOTSVYNYUK and

DMYTRO BOTSVYNYUK provided O.H. with approximately $1,000 to cover travel expenses

from Kiev, Ukraine, to Mexico.

In or around August 2001:

(73)    After O.H.'s release from a Mexican immigration detention center, BO associates

arranged for O.H. to travel with smugglers through an underground tunnel that led into a sewer,

and into the middle of a highway in Nogales, Arizona.

(74)    Defendant OMELYAN BOTSVYNYUK wired money to an intermediary known to

the grand jury as "Julia" in Arizona to finance the remainder of O.H.'s journey to Philadelphia.

(75)    Upon O.H.'s arrival in Philadelphia, defendant OMELYAN BOTSVYNYUK told

O.H., "Finally you're here, bitch."

(76)    Defendant OMELYAN BOTSVYNYUK put O.H. to work cleaning stores in

Quakertown, Pennsylvania, and Albany, New York.

(77)    Defendant OMELYAN BOTSVYNYUK struck O.H in the face for "talking back" to

him and a BO supervisor.

(78)    Defendant OMELYAN BOTSVYNYUK threatened O.H. by stating, "I don't want

any trouble with you.  If you give me trouble, I am gonna send you home [to Ukraine] and your

parents are going to pay [your debt]."

(79)    On or about July 23, 2002, after O.H., who was in Albany, New York, called

defendant OMELYAN BOTSVYNYUK in Philadelphia by telephone and told him that she was leaving his employ, defendant OMELYAN BOTSVYNYUK threatened to break her legs if he caught her.

## NOTICE OF SPECIAL SENTENCING FACTORS

The allegations and facts set forth in this Notice of Special Sentencing Factors relate to Count One of this Indictment.

1.     From in or around July 2001, to in or around April 2002, in the Eastern District of Pennsylvania, defendant OMELYAN BOTSVYNYUK knowingly held in a condition of peonage a person, hereinafter known as M.S.1, by means including aggravated sexual abuse and rape, in violation of Title 18, United States Code, Section 1581.

2.     From in or around August 2001, to in or around April 2002, in the Eastern District of Pennsylvania, defendant OMELYAN BOTSVYNYUK knowingly and willfully held in involuntary servitude a person, hereinafter known as M.S.1, for a term, by means including aggravated sexual abuse and rape, in violation of Title 18, United States Code, Section 1584.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO
**(Extortion)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 22 of the General Allegations, and paragraphs 18 through 31 and 38-42 of the Overt Acts section of Count One are incorporated by reference and realleged here.

2.      From in or around November 2002, through in or around spring 2007, in the Eastern District of Pennsylvania, Ukraine, and elsewhere, defendant

**OMELYAN BOTSVYNYUK**
**a/k/a "Milo"**

did obstruct, delay, and affect, and attempt to obstruct, delay, and affect, commerce and the movement of articles and commodities in commerce by extortion, and aided and abetted such, in that the defendant obtained and attempted to obtain the property of M.S.1, with her consent having been induced by the wrongful use of force, violence, and fear, including fear of economic loss, in that defendant OMELYAN BOTSVYNYUK demanded a thing of value, that is, M.S.1's physical labor and money, as a condition of not physically harming M.S.1 and her family and not kidnaping M.S.1's seven-year-old daughter (N.S.) in Ukraine and forcing her into prostitution.

All in violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT THREE
**(Extortion)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 22 of the General Allegations, and paragraphs 32 through 42 of the Overt Acts section of Count One are incorporated by reference and realleged here.

2.      From in or around November 2002, to in or around spring 2007, in the Eastern District of Pennsylvania, and elsewhere, defendant

**OMELYAN BOTSVYNYUK**
**a/k/a "Milo"**

did obstruct, delay, and affect, and attempt to obstruct, delay, and affect, commerce and the movement of articles and commodities in commerce by extortion, and aided and abetted such, in that, the defendant obtained and attempted to obtain the property of V.S., with V.S.'s consent having been induced by the wrongful use of force, violence, and fear including fear of economic loss, in that defendant OMELYAN BOTSVYNYUK demanded a thing of value, that is, V.S.'s physical labor and money, as a condition of not physically harming V.S. and his family and not kidnaping V.S.1's daughter (N.S.) in Ukraine and forcing her into prostitution.

All in violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT FOUR
**(Extortion)**

**THE GRAND JURY FURTHER CHARGES THAT:**

  1.  Paragraphs 1 through 22 of the General Allegations, and paragraphs 32 through 42 of the Overt Acts section of Count One are incorporated by reference and realleged here.

  2.  From in or around December 2001, through in or about November 3, 2005, in the Eastern District of Pennsylvania, and elsewhere, defendant

**STEPAN BOTSVYNYUK**
**a/k/a "Stoypa"**

did obstruct, delay, and affect, and attempt to obstruct, delay, and affect, commerce and the movement of articles and commodities in commerce by extortion, and aided and abetted such, in that, the defendant obtained and attempted to obtain the property of V.M., with V.M's consent having been induced by the wrongful use of force, violence, and fear including fear of economic loss, in that defendant STEPAN BOTSVYNYUK demanded a thing of value, that is V.M.'s physical labor and money, as a condition of not physically harming V.M. and his family.

  All in violation of Title 18, United States Code, Sections 1951 and 2.

## ALLEGATION OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violation of Title 18, United States Code, Section 1962(d) set forth in Count One of this indictment, which is realleged here, defendants

**OMELYAN BOTSVYNYUK,**
**a/k/a "Milo"**
**STEPAN BOTSVYNYUK,**
**a/k/a "Stoypa"**
**MYKHAYLO BOTSVYNYUK,**
**a/k/a "Misha"**
**a/k/a "Mykhailo Churyk"**
**a/k/a "Mykhaylo Churuk"**
**DMYTRO BOTSVYNYUK,**
**YAROSLAV CHURUK,**
**a/k/a "Slavko"**
**a/k/a Yaroslav Botsvynyuk"**

(a)  have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

(b)  have interests in, securities of, claims against, and property and contractual rights affording a source of influence over, the enterprise named and described in the indictment, which the defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(2); and

(c)  have property constituting, and derived from, proceeds which the defendants obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code,

-26-

Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963.

2.      The interests of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 1963(a)(1), (a)(2), and (a)(3), include, but are not limited to, an exact amount unknown to the grand jury, but in excess of $250,000.

3.      In the event that any property subject to forfeiture pursuant to Title 18, United States Code, Section 1963, or any property traceable to such property, as a result fo any act or omission of the defendant:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred, sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of the defendants, up to the value of the property subject to forfeiture.

4.     The above named defendants are jointly and severally liable for the forfeiture

obligations as alleged above.

All pursuant to Title 18, United States Code, Sections 1963(a)(1), (2), and (3), and

1963(m).

A TRUE BILL

_____

FOREPERSON

Michael L. Levy
United States Attorney

-28-